COURT

PAUL WILLIAM DRIGGERS, In Persona Propria
Reg. 00922-287
Federal Corr. Institute
P.O. Box 6000
Florence, CO 81226-6000

U.S. COURTS
MAR 05 2008
Rcvd ___ Filed ___ Time 10:08 A
CAMERON S. BURKE
CLERK, DISTRICT OF IDAHO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

PAUL WILLIAM DRIGGERS,
Plaintiff,

v.

THE IDAHO DEPARTMENT OF HEALTH AND WELFARE,
DAVID BECK,
CHRISTINA MCNUTT,
ROBIN JACOBSON,
LARRY PURVIANCE,
THE KOOTENAI COUNTY PUBLIC DEFENDERS' OFFICE,
ROBERT BURTON,
KAREN R. VASSALLO,
UNKNOWN BUT CERTAIN POST FALLS POLICE OFFICERS,
THE POST FALLS POLICE DEPARTMENT,
AMANDA GRAFE,
DENISE METZGER,
LINDA GREEN,
CASA,
DANIEL ENGLISH,
UNNAMED DEPUTY CLERKS OF THE KOOTENAI COUNTY COURT (Idaho),
THE KOOTENAI COUNTY COURT, and
EUGENE MARANO,
Defendants.

CIVIL ACTION NO.: ___________

# COMPLAINT

(42 U.S.C. Sections 1986, 1985 and 1983)

**ACTION AT LAW**

**CONSPIRACY AGAINST RIGHTS, DEPRIVATION OF RIGHTS, PRIVILEGES OR IMMUNITIES, ACTION FOR NEGLECT TO PREVENT INTERFERENCE WITH**

## JURISDICTION AND VENUE

1. This is a Civil action authorized by 42 U.S.C. Sections 1986, 1985, and 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1343(a)(3). Plaintiff seeks Declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202. Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. Sections 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

2. The federal District of Idaho is an appropriate venue under 28 U.S.C. Section 1391(b)(2) because it is the district wherein the events described in the Complaint occurred, and by the Diversity of Citizenship statute, 28 U.S.C. 1331 and 1332.

## PLAINTIFF

3. Plaintiff, Paul William Driggers, has been since August 16th, 2006, a prisoner of the United States in the custody presently of the U.S. Bureau of Prisons. He is currently confined in the Federal Correctional Institute located in Florence, Colorado.

## DEFENDANTS

4. Defendant, Idaho Department of Health and Welfare, is an agency and political sub-division of the State of Idaho, along with Children and Family Services, Child Protective Services, which are the employers of Defendants as described herein.

5. Defendant Denise Metzger, is employed by the Idaho Department of Health and Welfare (IdHW) and as described herein was

supervisor of co-defendants, Christina McNutt and Amanda Grafe.

6. Defendant, Robin Jacobson, upon information and belief was an employee for IdHW Children's Services at all relevant times mentioned herein.

7. Christina McNutt, Defendant, at the times described herein, was employed by IdHW as a Social Worker, assigned to investigate the family and home of the Plaintiff.

8. Defendant, Amanda Grafe, at all times mentioned herein was employed by IdHW as a Social Worker assigned as Case Manager to the children of the Plaintiff, said children by name being Milinda Driggers, Csarena Driggers, and Desarae Driggers.

9. Eugene Marano, is a magistrate sitting in the Kootenai County Court, magistrate's division, Coeur d'Alene, Idaho.

10. Daniel English is the Clerk of Court for the First Judicial District Court for the State of Idaho in Kootenai County, Idaho. He is reportedly the chief supervisor of the deputy Clerks employed in the Clerk's Office.

11. CASA is an organization of volunteers who devote their time to assuming the role of guardian ad litems to children deemed to be dependent or under the purview of the courts.

12. The Defendant, Karen R. Vassallo, is the former wife of Plaintiff, Paul William Driggers and the natural mother of the above named children.

13. David Beck is and was at the times mentioned an employee of the Post Falls Police Department, employed as a detective and the assigned officer for Child Protective Services.

14. Unknown but certain Post Fall Police Officers refers to the responding officials of said City Police department who were involved in the incident at Plaintiff's home on January 6, 2006, described herein and whose names should become a matter of record during Discovery.

15. The Post Falls Police Department is a creation of the City of Post Falls, Idaho, engaged in the business of policing and law enforcement for the City of Post Falls.

16. Robert Burton, Defendant, is [allegedly] a Magistrate within the Magistrate Division of the Kootenai County Court, First Judicial District of the State of Idaho, located in Coeur d' Alene, Idaho.

17. Defendant, Larry Purviance, at the times relevant herein was an employee of the Kootenai County Public Defender's Office in Coeur d' Alene, Idaho, allegedly a licensed attorney-at-law, assigned during the time described herein to represent Plaintiff Driggers in Magistrate Court.

18. And Defendant, Kootenai County Public Defenders Office is alledgedly a County agency in the business of providing legal services and representative counsel to indigent clients.

19. Linda Green is and was an appointed Guardian Ad Litem by the Defendant, Robert Burton, for the three (3) children named herein and a worker, member and agent of CASA situated in Coeur d' Alene, Idaho.

20. Each Defendant is sued individually and in his/her official capacity. At all times mentioned in this complaint each Defendant acted under the color of state law.

## PLAINTIFF'S NARRATIVE STATEMENT OF THE CASE

The background of this case begins in October 1998 when Karen R. Vassallo (Karen) and Paul William Driggers (Paul, Plaintiff) were married and Karen had not disclosed the full severity of her mental illness or the fact her doctors' prognosis was that she would never be able to co-exist with a man in a family setting.

Over the course of the marriage Karen presented as a very good wife and seemingly sane as anyone, most of the time (usually while on medication) and sometimes as a very bad wife and obviously mentally disturbed.

Three children (Desarae, Csarena and Milinda Driggers) were born of this marriage in 1999, 2000 and 2001 respectively.

Karen seldom manifested any symptoms of her schizophrenia in the hearing of any of the above three (3) children.

Karen had been married twice previously and as a result of her mental disease lost her children to their fathers.

Karen often expressed anxiety of losing her new children to Paul over the course of the marriage.

Paul found himself compelled to be a full-time father and husband to the four (4) children and a mentally disabled wife, in order to make sure they were all safe and were all adequately cared for.

In March 2004, the family relocated to Pocatello, Idaho, and one day Karen disappeared for weeks, only phoning to make irrational threats. In order to protect the children Plaintiff (Paul) filed for divorce and requested legal custody. Karen was served and processed by publication and noticed by Plaintiff. She chose to not participate or give her address. (later she would make accusations denying this.)

The divorce was granted in September 2004. Karen pleaded to return and "be given back my life." She stated she'd had a lot of time to think and that she could absolve Paul's concerns if given a last chance. She promised to stay on her medications and maintain normal behavior. Under these conditions Paul accepted her back into the family without a civil marriage.

In October 2004, Paul purchased a beautiful home on 5-acres of evergreen trees in Blanchard, Idaho, for the happiness of the entire family. For a year Karen, for the most part, kept her promises.

But then Karen declared she was no longer happy living three (3) miles from the nearest store. So reluctantly Paul sold the home and moved the family to Post Falls, Idaho.

At about this time the State of Idaho ceased providing Karen her discounted medications and Paul began the process of enrolling her in pharmaceutical manufacturer's programs. However, before this process could be completed Karen began a scheme to secretly alienate the children from Paul.

In trying to discipline one of the children Karen accidentally caused some bruises and thus began the chain of events described in this complaint.

From the time the children were born Paul took care of everyone and life was as normal as any family. Paul would take his children (and Karen's son, Nicholas, age ten years old) to school, special and social events, playgrounds, church, trick-or-treating, and so forth, like any good father would do.

There was nothing wrong or "unstable" in the family, unless the Defendants wish to cite the fact that the fourth child Nicholas (age 10) was ADHD and Karen was beginning to show some symptoms in November 2005. None of this should warrant forced entry by the State into the family. The children were in fact happy and well cared for by both mother and father. Paul had kept everything under good control but did not expect treachery. Yet, with the State actors herein, their agenda and Karen's agenda, they succeeded in destroying a perfectly good family.

Paul married Karen and stayed with her for seven (7) years out of love. He also believed he could help her overcome her mental disorder and maintain a happy life. Over the course of the marriage Paul was very good to Karen, manifesting deep and abiding love with much patience, understanding and hope.

Even after the children were removed from the home Paul stuck with her and in fact he had twenty-five (25) visits (one hour each) with his children in state custody, all wonderful and uneventful until the visits were suddenly cut off wrongly.

Once the events described in this Complaint got underway, it can only be described as "a gang" of various people, all strangers to the family, representing various state organs, all PILING ON in coordinated attacks on the father (Paul) with a common purpose and for each of their own self-serving ends and benefits.

Furthermore, Paul believes that Karen, in order to vanquish him as a possible custodian to her children, did motivate various officials and agencies of power by gaining sympathy toward herself and towards targeting Paul.

As a consequence, Paul's property was wrongly taken from him; the courts and lawyers took all his savings and equity to defend against baseless accusations; he was defrauded; he has been denied every human right enjoyed by most people such as the right to enjoy the offspring of his own body; or the right to be the master of his own destiny or to have any decision thereto[1] or to maintain the sense of dignity attendant to such rights. The "gang" described herein has disrespected every right belonging to Paul and done every evil wrong to him except to murder him.

DIVISION I. November, December 2005.

1. Defendant, David Beck, on or about November 18, 2005, contacted Plaintiff Driggers about a couple bruises on Mr. Driggers' minor daughter Desarae. He apprised Officer Beck he did not know about any bruises and suggested some possible causes. Mr. Driggers willingly went to the Post Falls Police Department and spoke with David Beck.
2. While Plaintiff Driggers denied striking Desarae the previous day and explained that she and the children were happy and well cared for, Detective Beck asserted that Mr. Driggers was guilty because Desarae told him so and he declared she was more credible than Mr. Driggers.
3. That at the initiation of the above described adversarial position by Officer Beck, Mr. Driggers declined to converse further with him. Whereupon Officer Beck issued Mr. Driggers a misdemeanor citation for "Injury to Child."
4. That David Beck became aware during the visit by Plaintiff herein, Mr. Driggers, that the Idaho DMV had very recently ordered revoking Mr. Driggers driving privileges to drive within the state.[2]
5. That instead of advising Mr. Driggers of this fact;

---

[1] Among other issues on Appeal of his federal conviction is the fact that contrary to FARETTA Paul was not allowed to make any decisions in his own defense or to choose his own defense but appointed counsel chose the defense and presented her defense, not the accused's defense. This proved to be a failure.

[2] Previously Idaho DMV had desired proof of insurance from Mr. Driggers. However, Mr. Driggers had changed his Idaho license for a Nevada license for commercial purposes. Because his Idaho license was cancelled there appeared to be no need to provide Idaho DMV with his Nevada business address or address in Idaho. Instead of sending the letter to the new business address on the valid Nevada records the Idaho DMV sent the request for information to Mr. Driggers' obsolete Idaho address. This was just a bureaucratic snafu.

6. He directed instead a patrol officer to stop Mr. Driggers on the road and arrest him for driving without privileges.
7. Moreover, David Beck as a police officer took advantage of the contrived arrest of Plaintiff Driggers to illegally and improperly invade the home of the Plaintiff.[3]
8. That Beck unreasonably, illegally and with the mind to take unfair advantage of an admittedly mentally ill person illicited a number of statements from Karen Vassallo, Beck willingly entered into an altered and unreal (psychotic) reality of Vassallo.
9. Further, in violation of the Fourth Amendment of Plaintiff Driggers' Constitutional Rights, as well as the Fifth and Fourteenth Amendments, Defendant Beck did seize or cause to be seized without probable cause the children of Plaintiff, taking them into custody.
10. Beck did all the above absent "reasonble inferences" in support of his claims that he avowed in connected petition for State Custody while such assertions would have been laughable but for the serious consequences of such claims.
11. That all the above was done to punish, degrade and humiliate the Plaintiff for his exercise of his RIGHT TO REMAIN SILENT, when Mr. Driggers had refused to continue a discussion with Mr. Beck.
12. David Beck, Defendant, was not acting in good faith and he did not seek positive evidence of the stability, happiness and safety of the family members such as interviewing neighbors or talking to any other children without being suggestive, or taking into account the visible "nice home" the family resided in that was visibly equipped and modeled and "attuned" to the needs of the children instead striving to present a false picture of the home situation.
13. That Defendant Beck did the above including the omissions of duty and observation to include in a report out of an ulterior motive of job justification, financial reward for himself and connected children's agencies, and the generated glory attendant upon the mere appearance of "stopping abuse."

---

[3] The United State Supreme Court has ruled that the consent of one party to entry of a dwelling by Police when the other inhabitant has not consented is inadequate under the 4th Amendment. SEE: Georgia v. Randolph, U.S. No. 04-106; 281 F.3 d 712.

14. Eventually the father, Plaintiff herein Driggers, was exonerated of the misdemeanor charge of Injury to child when the charge was dismissed for lack of evidence, ending in Mr. Driggers' favor.[4]

15. In continuing the chain of events from the above, Christina McNut of IDHW, a social worker, conducted a faulty investigation with a pre-determined outcome in mind, falsely finding that the family was "unstable" and the children at risk. Said report was full of unfounded declarations and conclusions.

    She submitted this erroneous and false report to Magistrate Robert Burton of the Kootenai County District Court.

16. Plaintiff alleges that the ulterior motive of Ms. McNutt was improperly political to divest father as male head of household of PATRIA POTESTAS and to please her state employee superiors.

17. On December 12, 2005, during a conference between Driggers (Plaintiff) and Larry Purviance and Defendant McNutt, McNutt offered to Mr. Driggers that he should sign the offered Agreement wherein he promised to obtain medical coverage on his children and enroll in a parenting class and that in exchange his children would be placed into his home immediately.

18. As a consequence of these [mis]representations by Ms. McNutt, Mr. Driggers did affix his signature to the document.

19. That this matter soon proved to be a fraud upon Mr. Driggers in that Mrs. McNutt disappeared permanently and Mr. Driggers' part was impossible to perform in that when he applied for coverage then IDHW advised him he had to have his children in home first in order to qualify.

20. Also on December 12, 2005, Court-appointed Attorney Mr. Larry Purviance made similar representations to the this Plaintiff consistent to those of Ms. McNutt and as being offers from the Attorney for IDHW and from Magistrate Robert Burton.

[4] A county Pathologist examined photographs of the bruises, issuing a report indicating a deduction there from that the child had not been truthful in identifying the belt used, or the time of the incident, or the clothing worn.

21. That Larry Purviance by sleight of hand obstructed the view of Mr. Driggers of the document presented to him for his signature, and told him it was a printed agreement for something other than it actually was. He also stated this document had the Magistrate's approval in returning the children to their home.

22. As a consequence of these words and actions by Defendant Purviance, Mr. Driggers did affix his signature to the document.

23. That soon after this Larry Purviance, Defendant, disappeared, making himself unavailable and deliberately avoiding Mr. Driggers.

24. That after-the-fact of the December 12th conference, IDHW Children's Services employee Robin Jacobson, Defendant, in a telephone talk with Mr. Driggers explicitly reiterated in her words to him her understanding of the same agreement made on December 12, 2005. (Reference paragraphs 17 – 20 above.)

25. Robin Jacobson, Defendant, then stated to Mr. Driggers she was in the process of keeping the agreement by working on making the various "medical check-ups" appointments for the kids and that she would have Christina McNutt call Mr. Driggers (Plaintiff herein). In reality none of theses representations materialized.

26. Finally, at this point Plaintiff completed an Affidavit of Fraud detailing the wrongful actions against him and filed it in the Kootenai County Court (SEE EXHIBIT '1' attached to complaint and incorporated by reference hereto) in his effort to move the Magistrate to appoint him a new counsel in the CPA case.

27. That Mr. Purviance also represented Mr. Driggers on a Traffic matter and Driggers, Plaintiff, filed a copy of the Affidavit of fraud to Magistrate Robert Burton on that case as well.*

28. That Robert Burton never took any action or precaution that his Court be not used to advance a fraud although he had reasonable notice that such occurred and was ongoing.

29. That all the above acts by Defendants constitutes fraud with all necessary elements. That is, fraud in the inducement; fraud in the factum; actual and constructive fraud and, Intrinsic and Extrinsic Fraud. The Defendants made false representations and concealed facts; they each had knowledge of the fraud; with

FOOTNOTES

* Subsequently Plaintiff learned from an employee in the RECORDS DEPARTMENT of the Kootenai County Court that magistrate Burton had taken the Affidavit out of the file to his office and never returned same. This was about the last part of February, 2006.
Plaintiff had been prompted to make this inquirie of the Record's Manager as described because the Kootenai County Clerk of Court Office had failed to return a conformed copy of the filing to the Plaintiff even though he had diligently included a copy for the purpose and a self-addressed envelope postage prepaid.
Eventually Plaintiff was able through search of the traffic archive files able to retriefv a copy

the intent to induce reliance; and the Plaintiff herein justifiably relied on the representations and as a result he suffered the loss of monies and his children.

30. That Magistrate Robert Burton has acted outside the scope of his authority, without statutory authorization, and knowingly totally without jurisdiction over the person or Mr. Driggers and without subject matter jurisdiction.

DIVISION II. January, February and March 2006

1. Defendant Karen Vassallo did at some point between October 1998 and November 2005 develop a scheme in her mind to proceed under the color of civil marriage to commit theft from Plaintiff of his biological property (that is, his children, gifted to him by the Creator, the issue of the union), and all material possessions and assets thereby leaving him impoverished, and Defendant Karen R. Vassallo (VASSALLO) practically destroying his financial existence and destroying his ability to defend himself, his liberty, or his interests.
2. On November 17, 2005, she accidentally bruised by discipline their child, Desarae, aged 6 years, then sent her to school intending to turn to her advantage her abusive actions with Desarae against Mr. Driggers in the eyes of the law. As a result of this action Plaintiff's children were removed from his home.
3. Thereafter on January 6, 2006, Karen R. Vassallo did plant a stolen handgun, hiding same in the bottom of a laundry basket located between a bed and closet in the bedroom inhabited by Mr. Driggers within the house.
4. Karen Vassallo then met with unknown BUT CERTAIN POST FALLS POLICE OFFICERS from the Post Fall (City) Police Department, and falsely claimed Plaintiff Driggers had threatened her with a gun and she then consented to a search of the house.
5. Immediately said Police awoke Mr. Driggers from his sleep and demanded entry to the house without a warrant. That as a matter of general principle Plaintiff Driggers objected to any entry and explained that any forced entry would be illegal and in derogation of his rights under the circumstances and prevailing law.

6. THE UNKNOWN BUT CERTAIN POST FALLS POLICE OFFICERS did nevertheless enter the house. They then escorted VASSALLO into the house after they took possession and secured the premises.
7. Whereupon said Post Falls Police Officers seized a handgun and announced it had been previously reported as stolen.
8. Plaintiff Driggers advised the said police officers that Karen Vassallo was psychotic, a schizophrenic, and had an evil plan to destroy him, and that they should pay her no mind but continue to investigate both of the parties' statements.
9. VASSALLO also informed them that she was suffering from paranoid schizophrenia.
10. Nonetheless over Plaintiff Driggers' objections and without probable cause they arrested Mr. Driggers.
11. They then and there gave VASSALLO plaintiff's credit and debit cards and all of his keys.

    VASSALLO immediately without authorization charged up the cards (accounts). She also stole his vehicles.
12. Upon preliminary hearing on the matter the case ended in Mr. Diggers' favor with a DISMISSAL of the charge for lack of Probable Cause.
13. Plaintiff alleges that the Police Officers of the Post Falls Police Department were motivated to act as they did out of bias in favor of the female figure in the situation and their personal dislike of Mr. Driggers arising out of the recent abuse charge and the shared policy of advancing the social goal of destruction of PATRIA POTESTAS further motivated and enhanced dislike by Mr. Driggers' refusal to "bow the knee" to them, or in other words to allow himself to be subjected or humiliated.
14. Continuing from January 2006 defendant Karen Vassallo resumed marshalling every segment of society and including its official arms in her support and against Plaintiff Driggers, even recruiting Women's organizations, with a design to push an offensive attack to disable and or destroy him unjustly.
15. She enlisted the help and financial support of the Mormon Church by using slander against Plaintiff.

16. She falsely swore to a Magistrate that she needed a Protective Order against Mr. Driggers because of [alleged] verbal threats by him. And, that she would not dispossess Mr. Driggers of his property if the protective order were granted.
17. Additionally moreover Amanda Grafe (Grafe), was present in the Court room on said date with Vassallo (January 19, 2006) and knew or should have known and/or had good reasons to know that the statements and avowals by Karen Vassallo were a fabrication and false, and she possessed good and credible evidence that they were false and a story.

    Yet she took no affirmative action to apprise the Court of the truth, in violation of her duty.
18. Although Plaintiff herein, the father of the subject children, held legal custody of his children as primary custodian, Karen represented to the Court that the children should be included in the Protective Order even though they were in truth subjects of a CPA case.
19. While being aware of this fraud on the Court by Vassallo, Grafe actually used the fraud herself to wrongly confuse the CPS records and cause delays in Mr. Driggers obtaining access to his children.
20. Magistrate (Marano) did issue the requested Protective Order.
21. Upon which Karen Vassalloo did promptly take advantage of the Protective Order to take by larceny an amount of property of great value (both pecuniary and sentimental) belonging to Plaintiff, with certain members of the Mormon Church aiding and abetting, away from Plaintiff's home, even though he had warned them not to do it.[5]
22. Over Plaintiff's objections the officers of the Post Falls Police Department did allow "under their noses" this larceny to occur, stating that they could not stop it because Vassallo claimed to be married to Mr. Drigers.[6]
23. Indicative of the fact that Vassallo knew or should have known, that she was not civilly married any longer to Mr. Driggers are the many declarations she made on

[5] In January 2007, judgment was given to Plaintiff Driggers in the Kootenai County Court, Case No. CV06-2497, for this wrongful act. However, Vassallo refuses to comply with the judgment in REPLEVIN.

[6] This position by Police would seem to be disingenuine because Vassallo had testified on January 19, 2006, as a Police witness that she was not sure she had ever been married. Plaintiff requested police to temporarily halt the theft just long enough to await arrival of the Divorce Decree from Bannock County.

various legal documents on file in connection with different cases. One such case is the civil lawsuit, Bonner County (2005), KRISTA CONLEY v. KAREN VASSALLO, Case No. 2005-288.

24. The Defendant, Police Officers, were happy to conduct the situati8on as they did because they believed that under the circumstances they could make excuse, and the ultimate motive was punishment of Mr. Driggers because of their failure in Court to indict him and their desire for revenge to assuage their own embarrassment.

25. On or about March 6, 2006, Karen Vassallo contacted and spoke with the FBI, making various unfounded accusations against Mr. Driggers, and gave them all of his paperwork and computer, out of which no charges came.

26. On or about March 12, 2006, Mr. Driggers alerted the Bonner County Sheriff's Office to seize his mini-van vehicle at a certain place, which Vassallo had stolen and this was done.

27. Directly afterwards on or about March 13th to the 15th, 2006, Vassallo, Grafe and David Beck all declared a new investigation was just beginning based upon an allegation which Vassallo made that day that Mr. Driggers in some past year had molested his daughters.

28. The above accusation was false, not made in good faith and the investigation was not genuine, not in a good faith effort, but a combined act of revenge.

29. Plaintiff Driggers alleges that the above was a ploy to give excuse to Amanda Grafe to delay reinstitution of visitation between the father and his children.

30. The above "investigation" lasted three (3) months at the end of which there was declared to be insufficient evidence to support any charges.

31. Thereafter, Grafe, instead of resuming visitation between the father and his children, stated the children were so fearful of their father that visitation could not be resumed and that he would have to build bridges to re-establishing a relationship.

32. The Plaintiff as the father alleges that this position by Amanda Grafe was a facade and contrivance and made for the purpose of delay.

DIVISION III. April, May June and July 2006

1. The Plaintiff requested a telephone talk with his minor daughters in foster care. Grafe responded it would be too traumatic for Mr. Driggers' daughters to speak with him on the phone due to their fear.
2. Amanda Grafe refused to allow her assertions (above) to be tested by means of any independent person speaking with the children, or by cooperating with discovery requests in providing audio or video of interviews, or allowing discussion with any professionals who had interviewed the children, or even a visit by extended family members.
3. The father of the children as Plaintiff herein asserts that Amanda Grafe established a CASE PLAN in bad faith, requiring Mr. Driggers to buy gifts and toys, cards and letters for his children in foster care, which he did to the tune of more than a thousand dollars.
4. Grafe required Mr. Driggers to buy furniture, establish a home, attend parenting classes, obtain psychological, all of which Mr. Driggers substantially completed.
5. That regardless of her promises and the fact of Mr. Driggers' compliance with her demands Grafe refused to resume any visitation.
6. The results of this conduct by Grafe was to further delay resumption of the parent-child relationship and it was not in good faith.
7. Plaintiff herein believes and asserts that all conduct described herein were "provoking" efforts, and part of a chain of wrongful actions to set up a case for presentation of phony arguments in support of a planned petition for termination of parental right – to seek and set up some way to steal Plaintiff's children by any possible means, including (although not limited to) possibly terminating paternal parental rights.
8. That Karen Vassallo, with the help of Amanda Grafe at times, and otherwise on her own, conducted a kind of "all out war" upon Plaintiff Driggers by misusing the courts and ignorant law enforcement officers.

   Vassallo continued to "chase" Plaintiff Driggers by gaining sympathy of various law officers for her stories and generating hostility against him by the same; by sending various law officers after him for [allegedly] violating the previously

issued PROTECTIVE ORDER, including (duped) Detectives from the Bonner County Sheriff's Department.

That is, Mr. Driggers would receive phone calls on his cell phone while he was in the hospital in Spokane, Washington, or hundreds of miles away otherwise from Bonner County, the Detectives accusing him of stalking Karen Vassallo.

9. Amanda Grafe was personally given by Clayton Anderson, a lawyer, a copy of the modification of the PROTECTIVE ORDER (allowing the father to have contact with his own children) yet she continued to assert that the PROTECTIVE ORDER included the children.

10. Plaintiff alleges that Grafe is an extremely deceptive and wiley individual employed by Idaho CPS and who is adept at "the tricks of her trade" due to long experience, and she routinely perverts the system of child protection statutes for her own benefits and ends.

11. As a continuing plan, in addition to everything else, Amanda Grafe falsely and for delay and probing and provoking purposes accused Mr. Driggers of "inappropriately touching" his daughters at some indefinite time past.

12. Plaintiff alleges that all the above conduct was in bad faith with the ulterior motive of destroying the relationship between this father (Plaintiff) and his children and to favor Karen Vassallo.

13. Furthermore, during a June 2006 hearing in the Court of Robert Burton, Grafe claimed that the State's professionals advised against contact between the Plaintiff, the father, and his children ostensibly for the reason that the children thought their Dad had a gun and would shoot them.

14. Thereat, the father, Mr. Diggers expressed to the Court that IDHW had in effect terminated all of Mr. Driggers' parental rights without the DUE PROCESS OF LAW owing to Mr. Driggers.

15. In response thereto, Robert Burton, in violation of principles of reasoning, and making no fair inferences, declared that if the children were fearful of the father and the professionals could not correct that, that he was prepared to terminate Mr. Driggers' parental rights.

16. He refused to rectify the unjust and illegal situation – while holding the appearance of jurisdiction – and Amanda Grafe of Idaho Health and Welfare Department continued to deprive the Plaintiff herein of his fundamental rights to maintain a relationship with his minor daughters.
17. Plaintiff alleges that Robert Burton was knowingly acting in the case without jurisdiction.
18. Plaintiff alleges that Robert Burton throughout the conduct of this case acted corruptly and with intellectual dishonesty.
19. Plaintiff alleges that the ulterior motive of Robert Burton was to allow perpetuation of the abuse under the color of law for the profit of the state and comity or bias in favor of Grafe and the Idaho Department of Health and Welfare much of this being influenced by benefits of federal funding of related programs.
20. During the month of July 2006, while the Plaintiff, Father, was compelled under the coercion and duress of the unlawful detention of his minor daughters by IDHW to continue compliance with the demands (extortion) of Grafe, that she declared a new excuse for delaying resumption of the parent-child relationship in that she alleged the children were citing new incidences of past physical abuse.
21. Also about the same time Grafe refused to allow the biological adult brother of the children, Jonathan Driggers, either as agent of the father or for himself, to visit his sisters, Grafe declaring that such a visit would not be in their best interest.
22. The above declaration by Grafe was not in good faith and it was a continuation of the chain of wrongful and unlawful actions by Grafe.
23. Amanda Grafe throughout July 2006, continued to deny the father's repeated requests for telephone contact with his minor daughters without good reason.
24. Mr. Driggers requested a brief hearing from Grafe and the IDHW supervisor Denise Metzger, for the purpose of presenting empiracle evidence showing that Karen Vassallo and Dasarae had not told the truth about the bruises she received, to alleviate any concerns they may have that may be causing delay in the case. They refused any hearing or further proof.
25. This refusal was an abuse of discretion as a continuing violation of the father's rights.

26. In late July 2006, Grafe again falsely claimed that there had been no modification of the PROTECTIVE ORDER and asserting consequently that there could be not contact between the children and their father.
27. The above was an ongoing egregious delaying technique.
28. Plaintiff Driggers filed a formal complaint about the situation with the [then] Governor of the State of Idaho. Five (5) days later Mr. Driggers was arrested by state police and federal authorities accused of Use of Interstate Facilities in the commission of murder for hire, and naming Karen Vassallo as alleged target.[7]

DIVISION IV. February and March 2007

1. The record will show Officer David Beck represented to federal authorities that Mr.Driggers had been a danger to Karen Vassallo and that they just had not been able to prove their case against him. That these assertions by Beck were prejudicial to Mr. Driggers (and logically unsupportable). The United States did not call Beck as a witness.
2. On May 22, 2007, a judgment of conviction was given against Mr. Driggers in the U.S. District Court for the District of Idaho, and a sentence of ten (10) years imprisonment imposed. An Appeal remains pending in the U.S. Court of Appeals for the Ninth Circuit on a number for grounds including violations of due process.
3. Amanda Grafe and IDHW, in connection with their plans and actions in abusing their powers for evil purposes, continued to refuse proper requests for discovery so that certain assertions by Amanda Grafe could be tested.
4. Magistrate Burton ignored Plaintiff Driggers'written request for an injunction, prohibition, or Writ of Mandamus he filed while representing himself Pro Se, which he filed while Pro Se in an effort to regain or enforce his rights to maintain a relationship with his daughters.
5. Grafe refused Plaintiff's renewed requests for photographs of his children, or to discuss the children, or to send him other than perfunctory reports.

[7] Karen had not been heard from since April 20, 2006; as of that date all visible or verbal attacks had ceased and she was silent.

6. On March 17, 2007, Karen Vassallo did wrongly cause a false misdemeanor charge of violation of 'CIVIL PROTECTION ORDER' to be lodged against the Plaintiff Driggers, alleging that Mr. Driggers was not suppose to mail greeting or birthday cards to his daughters, alleging violation of Idaho Code 39-6312.
7. This malicious action by Vassallo was a violation of Plaintiff's civil and constitutional rights in that: a) No such Protection Order existed but was a claim continuing the same sinister plan as her cohort Graffe using the same methods; and, b) even if such an order existed it would be invalid (P.O.P.S. v. GARDNER, 998 F.2d 764, 9th Cir. 1993), as Plaintiff has a fundamental and substantive right to maintain a relationship with his children.
8. This action concluded in a Dismissal.
9. This malicious action by Vassallo was in the Bonner County Court done with an improper and evil purpose of persecuting Mr. Driggers and illegally converting his parental rights to her own exclusivity, all in violation of the law.
10. Moreover the record will reflect that on May 22, 2007, Karen Vassallo appeared at the sentencing hearing of Mr. Driggers, her ex-husband, and addressed the U.S. District Court, as was her statutory right. Further, that she requested of the court that it sentence her ex-husband, whom she referred to as "Mister Driggers," to the maximum term of imprisonment for the reason she was afraid "Mr. Diggers" would get out of prison and obtain custody of "my children." Vassallo did not utter a word of concern or fear of Mr. Driggers for her personal safety or her life.
11. Plaintiff asserts that all the above conduct is revealing of vicious manifested deprivation of rights belonging to Paul William Driggers.

DIVISION V. June and July 2007

1. To the best of Plaintiff's information about May 29, 2007, IDHW brought a Motion to Robert Burton requesting permission to discontinue reunification efforts (!) and to file a petition for termination of Mr. Driggers parental rights. Without allowing for any fair chance to be heard Robert Burton granted the requested permission without hesitation or attention to any good conscience.

2. Records will also show that at this hearing Amanda Grafe did enter the Court record of the hearing her affidavit wherein she falsely swears, falsely reported that Mr. Driggers was convicted of solicitation to commit murder.
3. Plaintiff avers that Grafe did this false action in order to conform the family court record to fit the Idaho code whereas the actual violation of law Mr. Driggers was convicted of is irrelevant to the Idaho code or to any issue of severance of rights.
4. Plaintiff believes these actions by Robert Burton, as Magistrate, were done without any lawful jurisdiction, and that these acts and others by Robert Burton were wholly corrupt, motivated by the same improper purposes stated earlier herein and violative of rights and priveleges.
5. The Guardian Ad Litems of the children, CASA, and Linda Green have acted subservient to IDHW and Grafe.

   They have failed to practice legally sufficient truth-finding practices and reasoning. Their reports are replete with conclusions based on supposition and conjecture. CASA's conduct as a whole amounted to a bias in favor of condemnation of Mr. Driggers while refusing to consider any redeeming qualities.
6. Said Linda Green has acted with malice toward this Plaintiff based on her shared social and political philosophy of gender discrimination and favoritism toward IDHW and for pecuniary profit. Defendant Green in a spirit of bad faith forbade the father (Plaintiff) to telephone her to offer her any information, ask any questions, or provide any perspective. All this served as a type of "piling on" against Mr. Driggers.

7. The Defendants and each of them have been and are of one mind in "hiding" the children as one would hide evidence to cover-up the truth and improper actions of Defendants.

8. Plaintiff attaches hereto the sworn Affidavit of fraud referred to herein incorporating same, titled AFFIDAVIT OF PAUL W. DRIGGERS. This sworn Affidavit clarifies that the document labelled "Stipulation" and giving custody to the State is fraudulent and was procured by fraud. (SEE 'EXH. 1').

DIVISION VI. August - October, 2007

1. After discovering the fact Amanda Grafe had submitted into the court record as evidence an affidavit swearing falsely that he was convicted of an offense he had not been convicted of, Plaintiff mailed to the same court strict proof of the falsity of the affidavit along with a statement explaining that the appointed public defender would not communicate in order to act, or be capable of acting, in Plaintiff's interest to expose the fraud. This was the same public defenders' office that previously perpetrated the fraud against this Plaintiff via Mr. Purviance.

2. Plaintiff was able to ascertain through a phone call to the Kootenai County Clerk of Court's office that the above referenced documents that had been mailed had been received. However, contrary to the Clerk of Court's reassurance, she did not mail Plaintiff his conformed copy.

3. Upon Plaintiff's further inquirie made politely and respectfully of the clerk in the court office, the various deputy clerks at various times throughout the day "hung up on him" and then permanently electronically blocked at the Federal detention facility in Seatac, Washington, any further phone calls from Plaintiff.

4. On or about August 17, 2007, Plaintiff attempted to file a Civil lawsuit in the Kootenai County District Court (upper division) against Robert Burton and the Social Worker, therein complaining of the fraud. Instead of filing the new action and directing it, along with the application to proceed in forma pauperis, to the attention of the district court Judge, the clerks transferred it to a magistrate, Eugene Marano.

5. Whereupon, about September 3rd, 2007, a friend of Plaintiff delivered again the same lawsuit papers to the clerk along with an application to proceed in forma pauperis. The clerk advised the friend in behalf of Plaintiff that Magistrate Marano had ruled denying the application but that he had refused to sign any Order denying the request so that an appeal could be taken. Further explanations were denied.

6. Plaintiff has written letters to Daniel English and others involved

in said county court system, in an effort to obtain information on who the Court Administrator is; to obtain information on many matters but all inquiries have been rebuffed or ignored.
Plaintiff attaches hereto a copy of the Affidavit by Amanda Grafe that Plaintiff knows to be false now labelled 'Exhibit 'C'.'.

7. Plaintiff Driggers mailed to the Kootenai County Clerk of Court a 'Notice of Appeal' so that he could appeal to the state Supreme Court the denial of his request for a fee waiver. However the clerk(s) did not file said notice and did not return to Mr. Driggers his conformed copy of same although he provided the means himself for them to do so. Thereafter this Plaintiff filed a Petition for a Writ of Mandamus in the state Supreme Court to try to compel the Kootenai County Court to file his notice but then the Kootenai County Court denied any such previous case or filing existed, such that the State high court could receive no record. (Plaintiff did obtain a conformed stamped copy of the lawsuit his friend filed in the Kootenai County Court, and also a conformed copy of a Motion for Reconsideration of application for fee waiver, and all these docuemnts and more are available as exhibits.)
Plaintiff Driggers is entitled by law to collaterally challenge any actions of the Kootenai County Court due to the fact he can establish Extrinsic fraud in the conduct of the proceedings.

## LEGAL CLAIMS

1. Plaintiff re-alleges and incorporates by reference DIVISION I - VI including all paragraphs within.

2. The conduct by David Beck described in DIVISION I, Para. 1-14, and DIVISION II, Para. 27-30, violated the clearly established rights of Plaintiff including but not limited to his intention to unjustly interfere with the family relationships. The actions taken were grossly disproportionate to the need for action under the circumstances and were inspired by malice. This conduct also included a tacit conspiracy between Beck and Vassallo.
All this conduct in toto violated Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

3. The behavior in this affair by Christina McNutt described in DIVISION I, paragraph 15 through 19, was violative of Plaintiff's clearly established rights especially the right to DUE PROCESS OF LAW, and b nature the conduct was conspiratorial. By these actions Defendant McNutt violated the Constitutional rights of Plaintiff, in particular the Fourth, Fifth, Sixth, Ninth and Fourteenth Amendments of the national Constitution.

4. The conduct of Defendant Larry Purviance, as given in paragraphs 20-23, was in violation of Plaintiff's Fifth, Sixth, Ninth and Fourteenth Amendment rights as promised to Plaintiff by the Bill of Rights contained in the United States Constitution. The facts indicate a meeting of minds existed between Defendant Purviance and the State of Idaho actors amounting to a conspiracy to wrongly deprive Plaintiff of his rights.

5. The involvement of Robin Jacobson, although marginal also seem circumstantially conspiratorial in league with her peers and employers, as described in DIVISION I, paragraphs 24-25, in derogation of Plaintiff's Fifth, Ninth and Fourteenth Amendment rights in the United States Constitution.

6. The conduct of Robert Burton as described in DIVISION I, paragraph 26-30, comprising fraud and cover up, while he ignored 42 U.S.C. 1985 and 1986, also constituted conspiracy, in violation of Plaintiff's rights

to DUE PROCESS OF LAW under the Fifth Amendment, violation of the Sixth Amendment right to confront witnesses, violation of the Ninth Amendment right to be free of imposed or false jurisdictions, violation of the Ninth Amendment right to equal protection, and violation of the Thirteenth Amendment right to be free of involuntary servitude, all included within the United States Constitution.

7. The conduct of Defendant Karen R. Vassallo as detailed in and throughout the Complaint clearly unequivocably violated Plaintiff's Fourth, Fifth and Fourteenth Amendment rights in the United States Constituion as owed to him, and the proof of the conspiracy existing between Vassallo and the state agents is overwhelming.

8. The actions taken by the UNKNOWN BUT CERTAIN POST FALLS POLICE OFFICERS as related in DIVISION II: paragraphs 6-13; paragraphs 22-24; were in violation of Plaintiff's Fourth, Fifth and Fourteenth Amendment rights---Bill of Rights, U.S.C.A. They were also indicative of the conspiracy with the overt acts as described.

9. The conduct by Amenda Grafe detailed in DIVISION II, paragraphs 17-19, 27-32; DIVISION III, paragraphs 2-3; were transparently in violation of Plaintiff's rights guaranteed to him by the Bill of Rights Articles Five, Nine, Thirteen and Fourteen, United States Constitution; in that the conduct was violative of the Peonage and Involuntary Servitude Acts; in violation of the reserved rights clause; in violation of the concepts of due process of law and equal protection. Clearly her conduct was conspiratorial of one mind with co-defendants Vassallo, Beck, Denise Metzger, Robert Burton and Linda Green, in violation of the law pursuant to 42 U.S.C. 1986, 1985, and 1983.

10. The adverse conduct by Robert Burton reported in DIVISION III, paragraphs 13-19; and DIVISION IV, paragraph 4; and DIVISION V, paragraphs 1 and 4; are indicative of Fifth, Sixth, Ninth, Thirteenth and Fourteenth Amend-ment violations under the United States Constitution, Bill of Rights and the same acts were done in conspiracy with the other named Defendants also in violation of the law pursuant to the U .S. Code Title 42, Chapters 1985 and 1986.

11. The conduct and deliberate omissions of duty by Defendant Linda Green give cause to believe she was in a tacit conspiracy with the state agents

in this case in violation of the law contrary to 42 U.S.C. 1986, 1985 and 1983, in derogation of Plaintiff's rights as guaranteed to him through the Bill of Rights as outlined herein.

12. The roles and status' of the employers of the Defendants; CASA; The Idaho Department of Health and Welfare; The Post Falls Police Department; The Kootenai County Public Defenders Office; The Kootenai County Court; and Daniel English; are that they nonetheless are liable for the conduct of their employees named as Defendant's herein, arising out of negligence in training and the policies of which Plaintiff complains actually exist and show a specific pattern or series of incidents supporting a general allegation of custom or policy (e.g. DIVISION III, paragraph 16; paragraph 24) and clearly the evidence will show that Defendant Denise Metzger, as supervisor for IdHW, had full knowledge of the ongoing egregious conduct. All in violation of 42 U.S.C. 1986, 1985 and 1983, Constitutional rights owed to Plaintiff via the Fourth, Fifth, Ninth and Fourteenth Amendments.

13. As described previously herein Eugene Marano refuses to allow the Plaintiff to have access to the Kootenai County Court and refuses to allow him to conduct an appeal by ordinary means to a higher court in the jurisdiction of the State of Idaho, by refusing to allow Plaintiff's paperwork to be filed (Such as 'Notice of Appeal'), and by refusing to allow any fee waiver, and by refusing to put the denial in the record so that the denial might be appealed.
All this is violative of Plaintiff's First, Fifth, Sixth, and Fourteenth Amendment rights under the Bill of Rights.

14. Plaintiff has been and will continue to be irreparably injured by the conduct of the Defendants unless this Court grants the Declaratory and Injunctive relief which Plaintiff seeks.

15. This Court has supplemental jurisdiction over Plaintiff's State law claims under 28 U.S.C. Section 1367.

## EXHAUSTION OF LEGAL REMEDIES

Plaintiff has no realistic course of action available as an adequate remedy to the ongoing problem and his efforts have been frustrated by the state judicial system.

Plaintiff has no Idaho state law or case law resources available to him in his present circumstances. This alone seriously hinders his access to the state courts.

Any theoretical remedies of the state courts are actually unavailable to this Plaintiff as a practical matter. There exists numerous reasons for this such as hostility in general to any filing by this Plaintiff and the plethora of excuses given for denying or ignoring Plaintiff's efforts. Plaintiff has no adequate remedy in state courts to secure his Constitutional rights due to their requirement of first paying fees. The Plaintiff is even hindered from appealing any actions or omissions of duty towards Plaintiff by the lower court.

The Kootenai County Family Court is a court of limited jurisdiction and does not extend to the federal claims maintained by Plaintiff. (182 F. 3d 162; 1999).

The father, as Plaintiff, of the subject-matter children herein is not precluded from litigating in federal court because his claims of a conspiracy between Case Workers and the County have not been litigated in any State action.
(62 F. Supp. 2d 927). The Plaintiff is showing that he has been essentially barred from raising his federal claims in the State court action. (Wiener V. County of San Diego, 23 F.3d 263 (9th Cir., 1994).

There exists a particularly weighty need to exercise federal jurisdiction in this case because Plaintiff is seeking a hearing under 42 U.S.C. 1983.
Under such circumstances conflicting results, piecemeal litigation, and some duplication of judicial effort is the unavoidable price of preserving access to the federal relief which section 1983 assures. (Tovar V. Billmeyer, 609 F.2d 1291, 1293, (9th Circuit, 1979); Signad, 753 F. 2d 1338, 1340 (5th Cir., 1985)).

It is well settled that the pendency of an action in the state court is no bar to proceedings in the federal court having jurisdiction.

As Plaintiff detailed in his Complaint the State of Idaho through its various officials have "stolen" his children and continue to deny him his parental rights. There exists no legitimate State interests in this case, for it is not lawful for even a State to commit theft withjout due process of law. The concept of "state interest" is not even germain to this particular case in that there is no generic or general state interest in theft.

The (appearance of) State proceedings in this matter were initiated in bad faith, for purposes of harassment, revenge, and other improper motives, and under these and other extraordinary circumstances federal cases have been filed in domestic relations cases too. (Moran V. Conn. Dept. of Public Health, 954 F. Supp. 484; Newstein V. Orbach, 732 F. Supp. 333).

This court has an unflagging obligation to exercise jurisdiction. (Martinez V. Newport Beach City, 125 F. 3d 777 (9th Cir., 1997); Miofsky V. Superior Court of the State of California, 703 F. 2d 332, 338 (9th Circuit, 1983) ).

This court has no discretion under the circumstances.

This Plaintiff has previously filed this same Complaint in the federal district court for the Western District of Washington in Tacoma, Washington. In good faith Plaintiff believed that it was an acceptable venue because of his location and the fact that some events occurred in that district involving denial of access to the Idaho court electronically. However the court suggested that a more convenient forum for almost all the Defendants would be the district of Idaho.

The following is a minimal listing by Plaintiff of his efforts to seek redress from the Idaho state courts. This effort has continued for 24-months and no results are apparent. In December 2005 he filed an Affidavit of fraud with a request for new Counsel based on conflict-of-interest and the affidavit and request were ignored. Then Plaintiff filed a Petition for a Writ of Mandamus to the district court to compel a ruling and the exercise of his right to maintain a relationship with his children through contact, and this was ignored.
Plaintiff again filed a Motion for Discharge of Counsel and requested unequivocably, timely, and eloquently to exercise his right to represent himself Pro Se. Without any inquirie by the court the Plaintiff was ignored. Then Plaintiff filed a new Civil action collaterally challenging the ongoing fraud of the various false

documents and the Civil action was returned when a fee waiver was orally denied allegedly, although as implied above no denial was signed by any Judge. Plaintiff filed a Motion for Reconsideration of denail of fee waiver and it too was allegedly denied.

Thereafter Plaintiff filed a Notice of Appeal and the Kootenai County Court refused to file it. Therefore Plaintiff filed a Petition for a Writ of Mandamus in the Idaho Supreme Court in an effort to compel the county court to file the notice but the Kootenai County Court denied the existence of any record to the Idaho Supreme Court.

Plaintiff has also filed a counterclaim in the Kootenai County Court as a part of the previous State action but this too was ignored.

The injury to Plaintiff is "great, immediate and ongoing". (Postscript, 878 F.2d 1114; 1989, 8th Cir.,).

The State court has shown itself completely incompetent to deal successfully with what originally was a relatively minor domestic situation. They took a fairly normal family that was overall happy and destroyed it.

This case concerns Plaintiff's young children and family integrity. As wise courts have appreciated and commented upon, such things are far more important and precious than any property. (May V. Anderson, 345 U.S. 528, 73 S.CT. 840; 1953). Without justifiable cause it has now recently exceeded two (2) years since Plaintiff has seen or spoken with his three daughters. This situation not only needs to be rectified but Plaintiff is entitled to damages from the time his children were fraudulently and wrongly taken from him until such time as they are restored to their natural and proper relationship.

In most cases the damage from having to wait for the court and litigation process to complete is amenable to repair or restitution. However, in the circumstance involving young children the damage from extended total separation from a parent is irreparable and that damage is almost wholly attributable to the ordinary slowness of resolving issues in court. And, there really is no amount of money that can compensate for such losses.

The whole situation as it came about and exists today in Plaintiff's case is not substantially different from the human rights abuses perpetrated against families in totalitarian socialist states, as will be revealed by the facts in

this case.

As explained, this affair concerns Plaintiff's children and time is of the essence. In view of the substance, nature and importance of the case these matters should now take priority and the case expedited.

Otherwise, the impression is given that no court, federal or state, is actually amendable, or amenable, to resolving problems in Family law cases or protecting Constitutional rights but is only capable of destroying families.

Plaintiff has no reasonable expectation of obtaining a favorable outcome in State court and State action has been brought against Plaintiff Driggers for purposes of revenge and to deter Constitutionally protected conduct. (Brooklyn Institute of Arts V. City of NY., 64 F. Supp. 2d 184; EDNY, 1999).

The State of Idaho has abused its power to such an extent that their conduct is outrageous, shocking to the conscience, and at best arbitrary all in a Constitutional sense. (Storck V. Suffolk County Dept. of Social Services, 62 F. Supp. 2d 927; EDNY 1999).

ILLICIT APPLICATION AND MOTIVES BEHIND CHILD PROTECTIVE LAWS

As the Plaintiff will prove, the Idaho children's Services programs as administered by the Kootenai County offices State officials, professional workers and volunteers have all been corrupted by their self-interests and are "feeding off of" the vulnerabilities of each of the family members. It would be error and willful naivity to think or claim that these State affiliated actors have been acting in good faith or "just doing their job". The children to them are "commodities" and the father an advarsary to be discarded.
In effect the State actors herein have evolved the system of laws, federal grants, and police powers into a "Child Abuse Industry".

To impute good faith to the State officials is for the federal system to "work hand in glove" with the State of Idaho officials in robbing parents of their children. The doctrine of "comity" has no valid applicability in this case.

## RELIEF DEMANDED

**THEREFORE,** Plaintiff respectfully prays that this Court enter judgment granting Plaintiff:

1. A declaration that the acts and omissions described herein violated Plaintiff's rights under the Constitution and laws of the United States.
2. A preliminary and permanent injunction ordering Defendants, Karen R. Vassalo, Idaho Department of Health and Welfare, Amanda Grafe, and Robert Burton, to take affirmative action with all deliberate speed to resume contact between Plaintiff and his minor children; for this Court to order voiding the fraudulent jurisdiction of the State of Idaho in this family.
3. A declaratory judgment declaring Idaho statutes 16 – 1610 to 16 – 1643 to be unconstitutional in general or as applied to Plaintiff in his situation.
4. Compensatory damages against Defendants as follows:
   Amanda Grafe, two million dollars ($2,000,000); Idaho Department of Health and Welfare; the sum of three and one half million dollars ($3,500,000); Karen R. Vassallo, the amount of two and one half million dollars ($2,500,000); David Beck, the sum of one and one half million dollars ($1,500,000); the Post Falls Police Department, the amount of four hundred thousand dollars ($400,000); Robert Burton, the sum of two hundred fifty-five thousand dollars, ($255,000); as to Kootenai County Public Defenders' office the amount $165,000; and separately as to Larry Purviance, $165,000.00 is prayed; Christina McNutt, one hundred thousand dollars ($100,000); Robin Jacobson, the amount of eight thousand dollars ($8,000); and the amount of four thousand dollars ($4,000); from Linda Green, and CASA, three thousand dollars ($3,000).

5. Punitive damages as follows: as to Vassallo, IDHW, Grafe, Denise Metzger, David Beck, the Post Falls Police Department, the UNKNOWN POST FALLS POLICE OFFICERS, Robert Burton, Christina McNutt, the amount of One Hundred Eighty-Three Thousand dollars ($183,000) each; as to Robin Jacobson, Linda Green, and CASA, the amount of Two Thousand dollars ($2,000) each.
6. Plaintiff's cost in this suit.

7. A jury trial on all issues triable by jury.
8. Any additional relief this Court deem just, proper and equitable.

Respectfully Submitted,

Paul W. Driggers

Plaintiff in pro per

Dated: 25th February, 2008

## VERIFICATION

I have read the foregoing complaint and hereby verify that I am the Plaintiff, that the matters alleged therein are true, except as to matters alleged to be on information and belief, and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

I make this Affidavit under the penalties provided by law for perjury.

BY: Paul W. Driggers

PAUL WILLIAM DRIGGERS,
Affiant

DATE: 25th February, 2008